Young *v.* Young.

---

## HULDAH B. YOUNG et al.

*v.*

## WILLIAM YOUNG and PETER YOUNG.

1. A father verbally agreed with his son that if the son would live upon a designated farm, which belonged to the father, and repair, cultivate and improve it at his own expense, that he would give the farm to his son when he (the father) should be done with it; that he would either convey or devise the farm to the son. In reliance upon this agreement, the son entered into possession of the farm, and repaired, cultivated and improved it for twenty years, till he died, and thereafter his wife and his heir-at-law continued the performance of the contract upon his part, till the father died.—*Held,* that the contract was a valid one, which, because of the performance of it by and in behalf of the son, although not in writing, is enforceable in equity.

2. The son's widow will be entitled to dower in the farm.

Young v. Young.

3. The widow and the heir-at-law of the son are proper parties complainant to a bill to specifically enforce the performance of the contract.

4. The estates of the heir and the widow spring from a common source, and are not antagonistic to each other or so distinct and dissimilar that the widow and heir cannot join as complainants in a single suit for specific performance without making their bill multifarious.

5. Money was paid to the son's wife in May, 1849, and was expended by the son and his wife in the repair and improvement of the farm that his father had agreed to convey or devise to him.—*Held*, that such money was the property of the son, and that, after his death, to a bill by his widow and his heir-at-law, for specific performance of the contract between the father and son, containing an alternative prayer for the repayment of such moneys, the husband's personal representative must be made a party to take such moneys if repayment thereof shall be decreed.

6. A bill for specific performance, with a prayer for such alternative relief, is not multifarious.

7. A contract for the sale of lands may be specifically enforced against an alienee of the vendor, where such alienee has accepted a conveyance, either without having paid valuable consideration for it or with notice of the contract.

8. Where the complainants' right to specific performance of a contract for the conveyance of certain lands accrued in the year 1877, and in that year the complainants were evicted from the possession of the lands under and by virtue of a judgment which was then recovered against them in ejectment at law, in favor of the defendants, and thereafter for nine years they failed to apply to this court to compel the specific performance of the contract, or for other equitable relief—*Held*, that unless their laches shall be satisfactorily explained and excused, relief in this court will be denied them.

9. The judgment in the action of ejectment at law did not settle the equitable claims of the complainants.

10. By virtue of *Rev. p. 638 § 11*, a married woman may maintain a suit for specific performance of a contract to convey land to her, in her own name, without joining her husband as a party.

———

On bill and demurrer thereto.

The bill was filed on April 28th, 1886, and is exhibited by Huldah B. Young, who is the widow, and Dorothea, wife of Benjamin McCord, who is the heir-at-law of Jacob Young, deceased, against William and Peter Young, who are the brothers of Jacob Young. It represents that the complainant, Huldah, was married to Jacob Young on the 30th day of January, 1849, and that at that time Henry Young, the father of

Jacob, was the owner of several tracts and farms of land in Harmony township, in Warren county, and among them, one of one hundred and ten acres, which is described in the bill. And it then alleges the following facts : Upon the marriage of Jacob and Huldah, they took up their residence with Henry Young. After they had lived with him a short time, Henry informed Jacob that he had purchased the farm, described in the bill, for him, and that if he would move on it and keep it in repair, and improve and cultivate it, and bear the expense of doing so, that he, Henry, would give him the farm when he was done with it. Jacob agreed to this proposition, and with his wife moved upon the farm in March, 1849. When Henry put them in possession of the farm, he told Jacob, using the words of the bill, "to take, cultivate and improve and care for the same as his own, and it should always belong to him ; and that he, the said Henry Young, would convey the same to said Jacob Young by deed, or that he would devise the same to him by his last will and testament, to be by him, the said Henry Young, duly executed according to law, so that the said Jacob Young should own the same in fee-simple; that he, the said Jacob Young, should make whatever alterations, improvements and repairs he desired, in any manner he might wish, but that he must do it at his own cost and expense."

Jacob and Huldah remained in possession of the property, upon the terms thus determined, until the death of Jacob, on April 3d, 1876, and during all that possession treated the farm as Jacob's property, cultivated, repaired and improved it, and held Jacob out to the world as its owner.

In May, 1849, Huldah received $1,872.71 from her guardian, which she and her husband, prior to 1858, expended in making permanent improvements on the farm. In addition to this money Jacob also expended about $2,000, from his earnings, in similar improvements. Among those improvements were the planting of a large apple orchard, the raising and enlargement of the dwelling-house and the building of the kitchen addition to it, the building of an outside cook-house, a cistern, a tenement-house, a smoke-house, a wagon-house, a large farm barn, on

which the words "Jacob Young" were painted, new fences and other similar structures. Henry Young lived upon premises adjoining the farm and observed the making of the improvements designated and knew by whom and why they were made, and how they were paid for.

While the complainants were in New York, on the night of April 2d, 1876, Jacob Young was assassinated, at the dwelling upon the farm, by some unknown person. No conveyance of the farm had been made to him, but, prior to his death, his father had made a will by which he devised that property to Jacob, and by which, at the same time, he devised to each of his other sons, the defendants William and Peter, another farm.

About the day on which Jacob died, the defendants, William and Peter Young, procured their father to revoke the devise to Jacob, give a pecuniary legacy to Dorothea, and devise all his lands to them, and on the twelfth of the same month further procured him to execute another will by which his entire estate, except a pecuniary legacy to Dorothea, much smaller than that which had been previously provided for her, was given and devised to them.

On June 5th, 1876, a deed of conveyance, dated on the third day of that month, and purporting to have been made by Henry to his sons, William and Peter, was recorded in the clerk's office of Warren county. This deed purported to convey to William and Peter, for the nominal consideration of $1, all the real estate to which Henry had the legal title, including the farm which Jacob had occupied. The property thus conveyed was worth about $25,000.

After the death of Jacob the complainant, Huldah, remained in possession of the farm in question.

In June, 1876, William and Peter commenced an action against Huldah for trespass, but failed to pursue it.

In January, 1877, Henry Young died, leaving the will last mentioned in force. This will was subsequently duly admitted to probate.

In March, 1877, William and Peter commenced another action for trespass against both the complainants and also the husband

Young v. Young.

of Dorothea.  In defence to this suit title in the complainant, Dorothea, was pleaded.  In the same month William and Peter also brought an action of ejectment against the complainants to recover possession of the farm, in which suit the same defence was interposed.  At the trial of the ejectment suit, in September, 1877, the facts above stated were proved in defence of that suit, but, because William and Peter Young offered evidence to show an interruption in the possession by Henry within twenty years, judgment was entered in their favor, and, thereupon, the complainants submitted to judgment for nominal damages against them in the action for trespass.  The complainants were thereafter turned out of possession of the farm and William and Peter were put in possession of it, and they now continue in that possession.

The expenditures of Jacob and Huldah upon the farm were made in reliance upon the promises of Henry above set forth.

The bill claims that the complainants, Huldah, as widow, and Dorothea, as heir-at-law, are entitled to a decree against the defendants, which shall declare that the defendants hold the legal title of the farm in trust for the complainants, and which shall direct them to specifically perform the contract between Henry and Jacob, and also to account for the rents, issues and profits of the farm during the time they have held it in their possession, and that if such decree shall be impracticable, that then the complainants are entitled to a decree by which the moneys which were of Huldah, that were expended on the farm, shall be ascertained, and, with interest, charged upon the farm.

To this bill the defendants interpose a demurrer, assigning as the causes therefor the following:

1. That the bill is multifarious and inconsistent in that it unites a claim for the payment of money to Huldah Young, in which Dorothea has no interest, with a joint claim by both the complainants for a conveyance of the farm, such claims being antagonistic and conflicting.

2. That the bill shows no right in the complainant, Huldah Young, to recover the money she claims, from the defendants.

3. That both the money claim of Huldah and the joint claim

of Dorothea and Huldah to the land are barred by the statute of limitations.

4. That the bill is multifarious in that the claims of Huldah and Dorothea, to the real estate, are inconsistent and antagonistic, the one claiming as heir-at-law and the other claiming the right of dower.

5. That the bill shows that Jacob Young was never seized of an estate in which Huldah could have dower.

6. That Jacob Young did not die seized of the farm so that Dorothea could inherit it.

7. That Huldah Young has no right to ask for the enforcement of the contract between Henry and Jacob against the defendants.

8. That Dorothea McCord cannot ask the enforcement of that contract.

9. That no legal and binding contract was made between Henry and Jacob Young.

10. That Henry Young disposed of the farm to others in his life, and had a right to do so.

11. That it appears that all questions of title to the farm were settled by the judgments in the actions of ejectment and trespass referred to.

12. That the alleged contract between Henry and Jacob was not made in writing, as it should have been to be binding.

13. That the husband of Dorothea McCord should have been made a party to the bill.

*Mr. Louis H. Schenck* and *Mr. Barker Gummere,* for the complainants.

*Mr. J. G. Shipman,* for the demurrants.

THE CHANCELLOR.

To present in more logical sequence the causes of demurrer, I will consider them somewhat out of the order in which they are stated in the pleading. The ninth and twelfth causes, which question whether there was a contract to transfer the title of the

Young v. Young.

farm to Jacob, and whether, to insure its enforcement, it should have been in writing, lie at the foundation of the entire case, and should be first disposed of. The bill states that Henry Young proposed to his son Jacob, that if he would move upon the farm, keep it in repair and improve and cultivate it at his own expense, he would give it to Jacob when he, Henry, should be done with it. Jacob accepted the proposition. Henry then put him in possession, and stated the terms of the contract more definitely. They were, that the son should cultivate, improve and care for the farm as his own, and it should always be his, and the father would convey or devise it to him in fee. The subject-matter of the contract, the farm, was certain. The consideration was valuable. It was to be Jacob's performance of his promise to live upon, repair, cultivate and improve the farm, at his own expense. The terms were clear. For the consideration agreed upon, the farm was to become the property of the son when the father was done with it, and that was to be when the father pleased, during his life, or at his death. It was to be transferred by conveyance if the father pleased in his lifetime, or by his will if he retained the title until his death.

We are not without precedents of contracts, similar in all important particulars, which have been upheld in this state. In *France* v. *France, 4 Hal. Ch. 650*, a father agreed with his son that, if the son should live upon a lot of woodland that was indicated, and clear and improve such parts of it as he thought proper for tilling and meadow, he would convey the land to the son after the improvement had been commenced. The son accepted the proposition, went into possession, cleared a portion of the land, built upon it and continued to reside there. The contract was upheld by a decree for specific performance against the father. So similar contracts were sustained in *Van Dyne* v. *Vreeland, 3 Stock. 370; S. C., 1 Beas. 142;* and in *Davison* v. *Davison, 2 Beas. 246*.

While it is true that the contract concerns an interest in lands, and, within the terms of the statute of frauds, should be in writing, yet there has been, I think, such performance of it on the part of Jacob and his heir and widow, that equity will enforce

3

it though it is merely by parol.   It is an established doctrine of equity that where a verbal contract has been performed, in whole or in part, upon one side, so that he who has performed cannot be replaced in his former position, or adequately compensated for the injury he has suffered, in his behalf equity will decree the specific execution of the contract.   The foundation of the doctrine upon which this jurisdiction rests is the prevention of a fraud upon him who performs.   Wherever the doctrine has been applied, the elements of constructive fraud will be found to exist.   When they are absent, equity will refuse to interfere.   *Pom. Cont.* § *104; 2 Story Eq. Jur.* §§ *759, 761; Fry Spec. Perf. 174; Wallace* v. *Brown, 2 Stock. 308; Johnson* v. *Hubbell, 2 Stock. 332; Gilbert* v. *Trustees of East Newark Co., 1 Beas. 180; Brewer* v. *Wilson, 2 C. E. Gr. 180, 185; Cooper* v. *Carlisle, 2 C. E. Gr. 525; Eyre* v. *Eyre, 4 C. E. Gr. 102; Green* v. *Richards, 8 C. E. Gr. 32, 536; Dean* v. *Anderson, 7 Stew. Eq. 496.*

It appears in the present case that Jacob Young, confiding in his father's promise, entered upon the farm in 1849, and remained in possession of it for twenty-seven years, until he was murdered upon it, and that thereafter, till his father died, his widow and heir maintained the same possession.   During that time he cared for, repaired, cultivated and improved it, expending thereon not only his own earnings, but also moneys that he had obtained from his wife.   The contract was wholly performed to the time of his death, upon his part, and, apparently, in the utmost good faith.   It is manifest that after such performance, non-compliance with the agreement, upon the part of the father, would work a most grievous fraud.

The seventh and eighth causes of demurrer raise the question whether the widow and the heir-at-law of Jacob can enforce the performance of the contract.

It is established by abundant authority that where there is a contract for the purchase of land, it descends in equity to the heirs of the vendee; and they may call upon the executors or administrators of the vendee to discharge the contract out of the personal estate, so as to enable the heirs to demand a conveyance from the vendor.   The contract is regarded as executed, and the

property involved is considered as real estate. *Haughwout* v. *Murphy, 7 C. E. Gr. 531, 546*. Where the consideration has not been paid, the executor or administrator becomes a necessary party to a suit for the enforcement of the contract, because he must pay the consideration out of the personal estate, and may desire to dispute the contract. In *Pom. Cont.* § *490*, it is said of such a contract for the sale of real estate: "When the vendee dies before completion, unless the contract is strictly personal in its nature, so that the obligation is ended by the death, the suit for a specific performance must be brought by his heirs if he dies intestate, or by his devisee if his interest under the contract has been devised. This follows as a necessary consequence of the doctrine that an equitable estate in the land vests in the vendee which passes by descent or devise, and the heir or devisee, and not the personal representative, is entitled to the conveyance. Whether the administrator or executor of the deceased vendee must be joined as a party will depend upon circumstances. If the purchase-money has been fully paid before the vendee's death, his personal representatives have no real interest in the suit, and need not be joined; but if the purchase-price has not been paid, and the personal estate of the deceased vendee is liable for its payment, it would seem that the executors or administrators are necessary parties with the heirs or devisees." *2 Chitty Cont.* (*11 Am. ed.*) *1410; Fry Spec. Perf.* (*3 ed.*) *91; Story Eq.* § *177*. In *Downing* v. *Risley, 2 McCart. 93*, it was held that, in a suit of this character, the personal representative is a necessary party, because he has an equitable interest in behalf of creditors of the decedent; for upon deficiency of the personalty the real estate will become an asset for the payment of debts. I will not stop here to consider whether, after so great a lapse of time since the death of Jacob Young, that reasoning can control in this case, for upon another ground, hereafter stated, I conclude that the personal representative must be a party in this case.

That which has been said as to the causes of demurrer just considered disposes of the sixth ground of demurrer, which challenges the title of Dorothea as a complainant.

By the seventh ground, it is objected that the complainant,

Huldah, cannot have a right of dower in the farm because Jacob was not seized of a legal estate of inheritance in it. The doctrine of specific performance of contracts for the sale and conveyance of lands, mainly depends upon the principle that the contract transmits an actual equitable estate, and impresses a trust upon the legal estate for the benefit of the vendee. *2 Pom. Eq. Jur. 404; Haughwout v. Murphy, 7 C. E. Gr. 531, 546.* The statute of this state (*Rev. p. 321, § 1*) gives a right of dower in such a case. In *Cushing v. Blake, 3 Stew. Eq. 689, 695,* Mr. Justice Depue says: "A notable exception to the identity of equitable and legal estates formerly existed, in that a widow was not dowable in a trust estate. The grounds on which this exception rested are explained by Lord Redesdale in *D'Arcy v. Blake, 2 Sch. & Lef. 387.* This anomaly was removed in this state by the statute of 1799 (*Pat. 343*), and in England by act of parliament (*3 & 4 Wm. IV. ch. 105; Smith v. Spencer, 2 Jur. (N. S.) 778, S. C. on appeal, 3 Jur. (N. S.) 193*); and, both in England and in this State, a widow is now entitled to dower in an equitable estate of her husband the same as in his legal estates." *2 Sugd. Vend. (8 Am. ed.) 65.* I conclude, then, that the complainant, Huldah, has a right of dower in the farm. Her claim to dower is not inconsistent with, or antagonistic to, the claim of the heir. The estate of the heir is subject to the right of dower. Each estate is defined and distinct, and each is a part of the whole of which the recovery is sought. Both dowress and heir derive their respective interests from the contract. The success of one is necessary to the success of the other. The defence against one is the defence against the other. It is not necessary that their interest shall be co-extensive. A tenant for life and a remainderman may join in a suit respecting their interest in an estate, and a widow and her children, having successive interests in a trust, may unite to enforce it. *Story Eq. Pl. § 279 a.*

The second cause of demurrer questions the right of the complainant, Huldah Young, to recover from the defendants the moneys that her husband had from her and expended upon the farm. The bill does not make such a claim. By it, both com-

plainants seek this recovery. It will be remembered that Huldah and Jacob were married in January, 1849, three years prior to the passage and approval of the act " for the better securing the property of married women." By that act the property of a married woman was thereafter secured to her. *Rev. p. 636.* Previous thereto the personal estate that the wife possessed at marriage or thereafter, became the property of her husband, and her choses in action also became his property when they were reduced by him to possession. *2 Kent Com. 130 et seq.; Schoul. Dom. Rel. § 80 et seq.* The act of 1852 operated only upon property that was not vested in the husband at the time of its passage (*Henry* v. *Dilley, 1 Dutch. 302; Van Note* v. *Downey, 4 Dutch. 219*), and had no application to property which the wife, married before the act took effect, had in possession at the time of her marriage or thereafter before the act took effect. *Vreeland* v. *Vreeland, 1 C. E. Gr. 512, 526.*

The money of Huldah, which was expended in the improvement of the farm, came to her possession in May, 1849, and, by law, then became the property of Jacob. And this, even though some part of it may not have been expended until after the passage of the act of 1852. Having once vested in him, it did not thereafter, by force of that act, divest.

But it also appears that the expenditure of these moneys was with the full knowledge and consent of the complainant, Huldah, by her active participation, and without any understanding or agreement that they should thereafter be repaid to her. If the moneys belonged to her, and were not the property of her husband, as indicated, I think that the expenditure of them upon the property of the husband in the acquirement and improvement of a home for his family, as stated in the bill, constituted a gift of the moneys to him. *Black* v. *Black, 3 Stew. Eq. 215, 219,* and cases there cited. Under any of these views, Huldah would have no right to recover the $1,872.71. If such money recovery is had, it will be because Jacob's contract of purchase should not be enforced. It cannot be regarded as real estate to be recovered by the heir and widow, but, as personalty, must go to the personal representative. And here it becomes apparent that the personal

representative should be a party to the suit to enable the court
to do complete equity in the case.

This conclusion, that the personal representative of Jacob
Young is entitled to any money recovery in this suit, renders
it unnecessary to consider the first ground of demurrer, in which
it is insisted that the bill is multifarious in combining a separate
money claim by the complainant, Huldah, with a real estate
claim by both complainants. A prayer of the complainants for
a conveyance of real estate, combined with an alternative prayer
that if such relief cannot be afforded that the moneys which
were laid out upon the farm be repaid, does not make the bill
multifarious, even though the personal representative must be
made a party to receive that money. In the case in hand, it
would be a wise precaution to make the personal representative
a party, with a view to such alternative relief, because something
may arise in later stages of the suit that will preclude the spe-
cific performance of the contract between Jacob and his father,
but will not prevent the recovery of all money expended in the
performance upon Jacob's part. The personal representative is
not alone interested in such money recovery. If it should be
had, both of the complainants would be interested in it, one as
widow and the other as next of kin. The personal representa-
tive, if a party to the suit, would be interested in every question
in the case, because upon the success or failure of each question
his right to recover the money would depend. As to the prin-
ciple upon which a suit of this dual character rests, Judge Story
says (*2 Story Eq. Jur. 96*): "It has been laid down that if a
man has performed a valuable part of an agreement, and is in
no default for not performing the residue, there it is but reason-
able that he should have a specific execution of the other part
of his contract, or at least should recover back what he has paid,
so that he may not be a loser; for since he entered upon the
performance in contemplation of the equivalent from the other
party, there is no reason why an accidental loss should fall upon
him any more than upon the other." And the question as to
multifariousness is set at rest by the language of Vice-Chancellor
Van Fleet in *Ferry* v. *Laible, 12 C. E. Gr. 146, 150,* where he

Young *v.* Young.

said : "No general rule defining what causes of action may be properly joined and what cannot, can be laid down. The question is always one of convenience in conducting a suit, and not of principle, and is addressed to the sound discretion of the court. * * * If it appears that the causes of action or claims are so dissimilar or distinct in their nature that they cannot be heard and determined together, but must be heard piecemeal—first one and then the other—a clear case of fatal misjoinder is presented ; but where a complainant has two good causes of action, each furnishing the foundation of a separate suit, one the natural outgrowth of the other, or growing out of the same subject-matter, where all the defendants have some interest in every question raised on the record, and the suit has a single object, they may be properly joined, and the objection of multifariousness or misjoinder will not be sustained."

The third ground of demurrer here presents itself : To what extent does the laches of the complainants bar their claim to equitable interposition ? Unexcused laches in bringing a suit for specific performance of a contract will bar a complainant's right to the aid of this court. This doctrine rests upon the tenet that for the peace of society this court will discourage antiquated demands by refusing to interfere where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights.

The remedy by specific performance is discretionary. *Johnson* v. *Somerville, 6 Stew. Eq. 152; Blake* v. *Flatley, 17 Stew. Eq. 228.* In *Eads* v. *Williams, 4 De G., M. & G. 674, 691,* Lord Cranworth said : "Specific performance is relief which this court will not give, unless in cases where the parties seeking it come promptly, and as soon as the nature of the case will permit." The courts of this state have invariably been guided by the rule thus stated. *Van Doren* v. *Robinson, 1 C. E. Gr. 256; Haughwout* v. *Murphy, 6 C. E. Gr. 118; Lawrence* v. *Lawrence, 6 C. E. Gr. 317; Merritt* v. *Brown, 6 C. E. Gr. 401, 406; Reddish* v. *Miller, 12 C. E. Gr. 514, 521.* See, also, *Fry Spec. Perf. (3d Am. ed.) 526 and note,* where many cases are collected.

In the case under consideration the complainants' delay was

for nine years after they had been ejected by the defendants from the possession of the very farm of which thy now seek a con-veyance. For nine years the defendants have openly asserted a claim to the farm adverse to that of the complainants, and during all that time, for aught that appears to the contrary in the bill, the complainants have acquiesced in that adverse claim. As the bill now stands, I think the case is within the rule above stated.

The insistment in behalf of the complainants, that the defendants are trustees of this land for the complainants, will not relieve them from the application of this rule, for while it must be acknowledged, as a general principle, that, as long as the relation of trustee and *cestui que trust* is admitted to exist between the parties, and the trust continues, lapse of time can constitute no bar to proper relief of the *cestui que trust*, it is also well settled that this doctrine will not apply to implied or constructive trusts, nor even to an express trust, where an open, public, adverse claim is set up by the trustee against his *cestui que trust*, and the longer existence of the trust is denied. *Big. Fraud 33; 2 .Story Eq. Jur. 845; Kane* v. *Bloodgood, 7 Johns. Ch. 90; Dean* v. *Dean, 1 Stock. 425.* The defendants, in effect, denied the existence of any trust impressed upon this land in favor of the complainants from the Fall of 1877, and since that time, for nine years preceding the filing of the bill, have maintained an unmistakable attitude of denial of any trust.

The tenth ground of demurrer is that Henry Young disposed of the farm to his sons, William and Peter, in his lifetime, and that he had the right to do so.

There is no difficulty in the enforcement of the contract against the defendants if they had notice or knowledge of it at the time of the alienation of the property, or if they were mere objects of their grantor's bounty and not *bona fide* purchasers for value. If they are purchasers with notice, or without having given value for the land, they have no equity against him who has, in good faith, contracted with their grantor and given value upon the faith of that contract. They are liable to the same equity as their grantor, stand in his place and are bound to do that which he would be bound in equity to do. They take the land im-

pressed with the trust in favor of the person who has contracted with their grantor, and hold it as trustees for him, and can be compelled to specifically perform the agreement by conveying the land in the same manner and to the same extent as their vendor must have done had he not transferred to them the legal title. *Murphy* v. *Haughwout, 7 C. E. Gr. 531; Downing* v. *Risley, 2 McCart. 93, 96; Pom. Cont.* § *465.* The bill does not allege, in terms, that the defendants had notice or knowledge of the contract between Jacob Young and his father, but it sets forth circumstances from which such knowledge or notice may be inferred, and distinctly shows that the defendants are not *bona fide* purchasers for value.

All that it is necessary to say upon the eleventh cause of demurrer is, that while the actions of trespass and ejectment settled all questions as to the legal title between the parties to them, they did not and could not determine the equitable claims that the complainants had.    *Wells Res Adjudicata* and *Stare Decisis* § *328.*

The last ground of demurrer, that the husband of Dorothea McCord should have been made a party to the bill, is not well taken.    The statute (*Rev. p. 638,* § *11*) empowers a married woman to maintain an action in her own name for the " recovery and protection " of her property, without joining her husband as a party.

The demurrer will be allowed, with costs.